IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

HOWARD E. NEASE and
NANCY NEASE,

          Plaintiffs,

v.                                                       CIVIL ACTION NO.   3:13-29840

FORD MOTOR COMPANY,
a Delaware Corporation,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

On April 3, 2015, a jury awarded Plaintiffs Howard E. and Nancy Nease $3,012,828.35 in damages as the result of an automobile crash. On the verdict form, the jury found that Defendant Ford Motor Company was liable to Plaintiffs because the 2001 Ford Ranger Mr. Nease was driving at the time of the crash was defective and not reasonably safe for its intended use, and the defect was the proximate cause of Plaintiffs' injuries and damages. *Verdict Form*, ECF No. 216. Although the jury found in favor of Plaintiffs on their strict liability claim, the jury found in favor of Ford on Plaintiffs' claims of negligence and breach of warranty. *Id*. Ford now has filed two post-trial motions. First, Ford has filed a Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. ECF No. 238. Second, Ford has filed a Motion, in the Alternative, for a New Trial pursuant to Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure. ECF No. 240. Plaintiffs also have filed a Motion for Leave to Submit a Sur-Reply. ECF No. 250. For the following reasons, the Court **DENIES** Ford's motion pursuant to Rule 50(b) and **DENIES, in part,** and **GRANTS, in part,** Ford's

motion pursuant to Rule 59(a)(1)(A). The Court also **GRANTS** Plaintiffs' motion to file a Sur-Reply.

**I.
RULE 50(b) MOTION**

Pursuant to Rule 50(b), this Court must determine "whether a jury, viewing the evidence in the light most favorable to [the nonmovant], 'could have properly reached the conclusion reached by this jury.' If reasonable minds could differ about the result in this case, . . . [the Court] must affirm the jury's verdict." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003) (citations and internal quotation marks omitted); *accord Int'l Ground Transp. v. Mayor and City Council Of Ocean City*, 475 F.3d 214, 218–19 (4th Cir. 2007) ("When a jury verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." (citation omitted)). In this case, Ford argues that there was insufficient evidence to support the jury's verdict for strict liability because the claim was dependent upon the testimony of Plaintiffs' expert Samuel J. Sero. Ford asserts the Court erred in permitting Mr. Sero to testify because he was not qualified and his testimony was unreliable and lacked foundation. Ford further argues that, even if admissible, Mr. Sero's testimony was insufficient to establish a defect.

The essence of Mr. Sero's testimony in this case was that, at the time of Mr. Nease's crash, contaminants bound the speed control cable in his 2001 Ford Ranger, causing the throttle to stick in the open position and making the brakes ineffective in stopping the vehicle. By

Memorandum Opinion and Order entered on March 13, 2015, this Court previously found Mr. Sero's testimony admissible. As the Court stated therein, Mr. Sero "is a registered professional engineer with a degree in electrical engineering." *Mem. Op. & Order*, at 2, ECF No. 172. He has experience in "the design and operation of mechanical systems in a variety of settings, in addition to his forensic evaluations." *Id*. His opinions in this case involved general engineering principles, for which he has the "knowledge, skill, experience, training, [and] . . . education" to testify. Fed. R. Evid. 702, in part. In considering the arguments made by Ford, the Court found they went to the weight, not the admissibility, of Mr. Sero's testimony. *Mem. Op. & Order*, at 3. Therefore, the Court denied Ford's Motion to Exclude. *Id*. Ford renewed its motion at trial, and the Court again denied it.

Ford now argues, inter alia, that Mr. Sero's testimony was unreliable because the borescope examination he performed on the cable lacked scientific methodology. During cross-examination, Mr. Sero was shown the borescope examination he performed in this case compared to a borescope examination he performed in another case. Although he could not distinguish between the two borescopes, he opined in this case the cable was bound, but in the other case the cable was not bound. Ford asserts this evidence proves Mr. Sero's testimony is unreliable and merely speculative. Additionally, Ford argues Mr. Sero never demonstrated unidirectional binding of Mr. Nease's speed control cable, he did not attempt to simulate his theory, he did not conduct any tests that a foreign substance could withstand the seven-pound spring pressure, he did not demonstrate alternative designs were equally or more safe, and he has never published his theory in a peer-reviewed journal. Thus, Ford contends the Court should have excluded Mr. Sero's testimony.

This Court rejects Ford's contention that Mr. Sero engaged in "junk science." Mr. Sero relied upon Ford's own fault tree analysis and Potential Failure Modes and Effects Analysis (FMEA). FMEA is the methodology developed by Ford and adopted by the Society of Automotive Engineers. Mr. Sero also conducted visual inspections of Mr. Nease's truck; collected data from the vehicle, the cable, and the guide tube; performed a borescope examination of the cable and guide tube; and applied general engineering principles in reaching his opinion. Mr. Sero further stated that the methodology he employed is consistent and trustworthy and what historically is used in failure to decelerate cases. Although Ford's counsel questioned Mr. Sero about the borescope he performed in another case, Mr. Sero explained that the facts of the two cases were different and the facts in the other case led him to reach a different conclusion than he did in the present case.

Specifically, in this case, Mr. Nease gave compelling testimony that he was operating his truck in an ordinary fashion when the accelerator pedal stuck and the truck went out of control for a considerable distance before he struck a brick wall. A witness at the scene, John Alan Kemplin, Jr., testified that he saw Mr. Nease's truck traveling fast off the road, through landscaping, over curbs, and through a carwash bay and the throttle sounded as if it was in a wide-open position. Trial Tr., 26-30, Mar. 25, 2015, ECF No. 249. He further stated that, after Mr. Nease hit the wall, his truck continued to run with a wide-open throttle, with the tires spinning, until the engine blew. *Id.* at 36. In addition, the police officer who responded to the scene, Jacob Dent, testified he found that the accelerator pedal was in the down position, and he directed another officer to photograph it. *Id.* at 65. All of this evidence is consistent with Mr. Sero's

opinion that the pedal was stuck. Given Mr. Sero's explanation as to how he reached his opinion and the totality of his testimony, the Court finds that Mr. Sero did not engage in "junk science."

Upon examination of the cable and the guide tube, Mr. Sero identified contaminants and gouges in the in the wall of the cable housing on Mr. Nease's vehicle. Mr. Sero testified to a reasonable degree of engineering certainty that the contaminants made the cable bind and the throttle to stick in the open position. Trial Tr., 82-83, Mar. 26, 2015, ECF No. 221. He further opined it would not take much binding to resist the seven-pound spring and the brakes would be ineffective in this type of situation. *Id*. at 57 & 83. Upon his review and analysis, Mr. Sero opined that the speed control system was defective and not reasonably safe. *Id*. at 83. Additionally, he stated there were other safer design alternatives, such as a nipple wipe and a boot, which existed prior to the 2001. *Id*. at 81. Mr. Sero explained his conclusions, and Ford cross-examined him on his methodology and conclusions.

As this Court stated in its earlier Memorandum Opinion and Order, Mr. Sero's testimony was consistent with Ford's own engineers. *Mem. Op. & Order*, at 2, ECF No. 172. Ford's "design engineers had recognized, many years before when Ford developed the basic configuration of this throttle control system, that a cable such as this may become jammed from foreign material which typically may be found under the hood of a vehicle." *Id*. at 2. Ford agrees it identifies a jammed cable as a potential problem, but it asserts its design addressed the problem and there is no evidence any cable actually has jammed. However, after listening to Ford's thorough cross-examination of Mr. Sero and the other evidence presented, including Ford's own experts, the jury obviously rejected Ford's argument that the potential problem was resolved.

Based upon the evidence, the Court also rejects Ford's argument that Mr. Sero's methodology was unreliable and based upon his "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (4th Cir. 1998). The Court finds that Ford's arguments go to the weight the jury should afford Mr. Sero's testimony, not its admissibility. Given the evidence presented and viewing it in a light most favorable to Plaintiffs, the Court has no difficulty finding a reasonable jury could have reached a verdict in favor of Plaintiffs on their strict liability claim. *See* Syl. Pt. 4, *Morningstar v. Black & Decker Mfg. Co.*, 253 S.E.2d 666 (W. Va. 1979) (stating "the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made"). Accordingly, the Court **DENIES** Ford's Renewed Motion for Judgment as a Matter of Law.

## II.
## RULE 59(a)(1)(A) MOTION

In its alternative motion for a new trial under Rule 59(a)(1)(A), Ford argues the verdict should be set aside because (1) there was an improper jury instruction; (2) the jury's verdict on strict liability is inconsistent with its decision on negligence; (3) the Court erred in allowing evidence of other incidents; (4) the verdict is a miscarriage of justice because Plaintiff used altered or false evidence; and (5) the Court erred in allowing undisclosed opinions from Mr. Nease's treating physician, Dr. Moreland, and denying rebuttal testimony from Ford's expert, Dr. Lisa Gwin. The Court will separately address each of these grounds.

## A.
## Jury Instruction

Ford's first argument is that the Court erred in giving the following jury instruction: "If a product can be made safer and the danger may be reduced by an alternative design at no substantial increase in price, then the manufacturer has a duty to adopt such a design." Trial Tr., 200, Mar. 31, 2015, ECF No. 232. Ford argues that there is no standard in West Virginia that a manufacturer has a duty to adopt an alternate design if a product can be made safer at no substantial increase in price. Instead, the strict liability standard entails determining whether "the manufacturer use[d] reasonable care in designing and manufacturing the product at the time it was marketed, not whether it could have possibly been made better or more safe, or later has been made better or more safe." *Chase v. Gen. Motors Corp.*, 856 F.2d 17, 20 (4th Cir. 1988) (applying West Virginia law); Syl. Pt. 4, *Morningstar*, *supra*. Ford argues that the instruction erroneously suggests that it had a duty to adopt the safest possible design at a comparable cost, rather than whether the design it actually used was reasonably safe.

On the other hand, Plaintiffs point out that the West Virginia Supreme Court also held in *Morningstar* that economic costs are appropriate factors for the jury to consider under the strict liability in tort standard. Specifically, it stated that "[t]he term 'unsafe' imparts a standard that the product is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, . . . as it relates to economic costs, at the time the product was made." Syl. Pt. 5, *Morningstar*. Thus, Plaintiffs argue the instruction is accurate. Moreover, Plaintiffs assert that, even assuming arguendo that the instruction was erroneous, Ford has suffered no actual prejudice and, therefore, there is no reversible error.

In its Reply, Ford does not dispute design and economic costs are factors to consider. However, Ford asserts there is no "duty to adopt" a particular design based on cost. Ford argues that Plaintiffs' instruction ignores the threshold determination that a product is "unsafe" before there can be a determination as to whether the unsafeness of the product can be designed away at a reasonable cost. Under Plaintiffs' instruction, Ford insists it would have to adopt an alternate design even if its product already is reasonably safe.

In considering whether a particular jury instruction should result in a new trial, the Fourth Circuit has stated that "[a] jury charge must be construed in light of the whole record." *Abraham v. County of Greenville, S.C.*, 237 F.3d 386, 393 (4th Cir. 2001) (citation omitted). If a jury instruction is given in error, "a judgment will be reversed . . . only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Id.* (citation omitted); *accord Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 484 (4th Cir. 2007) (stating "jury instructions will not furnish a basis for reversal of an adverse verdict so long as, taken as a whole, they adequately state the controlling law" (internal quotation marks and citation omitted)).

Assuming arguendo that the instruction in this case overstates the law in West Virginia, the Court finds the instruction was of no consequence and was harmless error. First, the jury expressly found on the verdict form that Mr. Nease's 2001 Ford Ranger "was defective in that it was not reasonably safe for its intended use." *Verdict Form*, 1, ECF No. 216. Thus, as the jury determined the product was defective and not reasonably safe, the jury never reached Ford's argument that a jury could decide, based upon this instruction, that Ford had a duty to the make an

already safe product safer if it could do so at a reasonable cost. Second, even if the jury had not made this express finding that the Ranger was defective from the outset, the instruction Ford asserts is erroneous is a single sentence amongst five-pages of instructions on strict liability, which is just a small part of the overall instructions. Trial Tr., 189-215 & 285-87, ECF No. 232. In context, these instructions further provided:

> Now, in this case plaintiff has alleged that there were design alternatives available to Ford which, had they been adopted, would have prevented the injuries and damages to the plaintiffs. Such a showing by the plaintiffs in and of itself is not sufficient to establish that the design used by Ford was defective. The plaintiffs are only entitled to a reasonably safe product, not an absolutely safe one.
>
> In balancing the benefits and risks of a vehicle's design, you may consider the cost, feasibility, and utility, usefulness, of alternative designs for the Ford Ranger. If a product can be made safer and the danger may be reduced by an alternative design at no substantial increase in price, then the manufacturer has a duty to adopt such a design.
>
> In presenting a design alternative for the subject vehicle, plaintiffs must establish that their design is feasible and show that it would have eliminated or significantly reduced the risk about which they complain, while at the same time not creating other hazards or harms or risks of injuries.

*Id*. at 200-21. The jury was fully instructed on what constitutes a defect and strict liability under West Virginia law, including the *Morningstar* standard quoted by Ford. *Id*. at 197-201. In addition, the Court instructed the jury that, although Plaintiffs are entitled to a reasonably safe product, they are not entitled "to an absolutely safe product." *Id*. at 200. The Court finds that Plaintiffs presented more than sufficient evidence to support the jury's verdict in favor of their strict liability claim. Therefore, based upon the record as a whole, the Court finds no reversible error. [1]

---

[1] Ford further asserts that Plaintiffs' counsel's mention of this instruction during his closing

## B.
## Strict Liability & Negligence

Ford next argues that the verdict is inconsistent on its face because the jury determined "by a preponderance of the evidence that the 2001 Ford Ranger owned by Howard Nease was defective in that it was not reasonably safe for its intended use," but the jury also found Ford was not "negligent with respect to the design of the 2001 Ford Ranger owned by Howard Nease." *Verdict Form*, 1-2, ECF No. 216. Ford insists that the inconsistent verdict also demonstrates the jury's confusion as a result of the "duty to adopt" instruction. In order to prove negligence, a plaintiff must prove "duty, breach, causation, and damages." *Carter v. Monsanto Co.*, 575 S.E.2d 342, 347 (W. Va. 2002). On the other hand, "'strict liability in tort' is designed to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability." Syl. Pt. 3, *Morningstar*. To prove strict liability, a plaintiff must prove a "product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made." Syl. Pt. 4, *id.* Thus, the negligence and strict liability are different concepts under West Virginia law, and it is possible for a jury to find in favor of a plaintiff under a strict liability theory, but find in favor of defendant on a negligence theory.

---

argument seriously prejudiced it. For the reasons stated above, the Court rejects Ford's argument. In addition, the Court recognizes that Plaintiffs' counsel brief mention of this instruction was followed by a statement that the jury could "find that Ford breached its duty," which implicates a negligence theory, not strict liability. *Id.* at 238.

Here, the Court finds the jury easily could conclude that, although there existed a design defect for purposes of strict liability, the design of the product did not violate an industry standard for purposes of negligence. In fact, although there was testimony as to Ford's practices, there was very little testimony about what the practices of the automotive industry were at the time. Thus, given the totality of the evidence presented, the Court finds no inconsistency in the verdict[2] and **DENIES** Ford's motion on this issue.

## D.
## Evidence of Other Incidents

Ford also argues that the Court erred in admitting evidence from *Huber v. Ford*, Civ. Act. No. 01-C-391 (Cir. Ct. of Monongalia Cty., W. Va.), and *Olson v. Ford*, 4:04-cv-00102-DLH-SCM (N.W. Dist. N.D. 2006), because Plaintiffs did not establish the vehicles involved in those cases had substantially similar speed control cables as the 2001 Ford Ranger driven by Mr. Nease. Therefore, Ford asserts the evidence should have been excluded pursuant to Rules 401, 402, 403, 404(b), and 801 of the Federal Rules of Evidence. However, the jury was instructed the evidence could not be considered at all with respect to Plaintiffs' strict liability claim. Specifically, the Court instructed the jury that:

> [i]n this case, the plaintiffs offered testimony concerning reports made to Ford of alleged other incidents of unintended acceleration. You are instructed that you may only consider the alleged other incidents for the limited purpose of determining whether Ford had notice of the defect that the plaintiffs allege. You may not consider this testimony for any purpose in evaluating plaintiffs' strict product liability claim, and you may not consider it as evidence that the 2001 Ford Ranger was defective or not reasonably safe for its intended use.

---

[2]Moreover, "even if the general verdicts are internally inconsistent, such is the jury's prerogative if . . . there is evidence to support the finding reached by the jury." *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973).

Trial Tr., 192, ECF No. 232. Thus, as the jury was instructed it only could be considered for the purpose of notice and not for the purpose of evaluating Plaintiffs' strict liability claim, the Court **DENIES** Ford's argument.[3]

### E. Allegation of Altered or False Evidence

Ford further argues that the case was based upon "altered" or "false evidence" regarding the position of the acceleration pedal. Specifically, Ford asserts the Court erred in allowing Officer Dent to testify that he observed the accelerator pedal in the down position and had it photographed. Trial Tr., 65, ECF No. 249. However, when the pedal was inspected by Mr. Sero nearly a year later, the pedal was in its normal position. Therefore, Ford insists evidence of the accelerator pedal being down was either spoliated or the evidence presented by Office Dent was false.

The Court finds no merit to Ford's spoliation argument. To prove spoliation, a party must show:

> [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the

---

[3] When discussing the jury instructions outside the presence of the jury, the Court stated that it "already ruled that evidence about the cables in *Huber* and *Olson* and Mr. Sero's inspection of them produces enough substantial similarity that it's relevant and that it can go to defect, but – and the parties can argue that, but I don't have an instruction before me. So it's premature to object." Trial Tr., 65, ECF No. 232. When the actual jury instructions were read to the jury, they specifically included the aforementioned limiting instruction. Given this limiting instruction, it was of no consequence that Plaintiffs' counsel stated during closing argument that "[y]ou also heard Ford claim that stuck throttles because of clogged up cap tubes don't happen in the real world, that there is no evidence of it. . . . Remind them when Mr. Sero talked about the *Huber* and the *Olson* cases that basically had substantially similar design of the speed cables." *Id*. at 233.

> evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Goodman v. Praxair Serv., Inc.*, 632 F. Supp.2d 494, 509 (4th Cir. 2009) (internal quotation marks and citations omitted).

In this case, Mr. Nease was taken to the hospital with serious injuries following the crash. As is typical in this situation, his truck was towed to a salvage yard, and Mr. Nease had no control over the vehicle. The truck was then moved to a different salvage yard by his insurer. The truck was not returned to Mr. Nease's control until April of 2013, five months after the crash, when Plaintiffs' counsel was able to locate the truck and purchase it for salvage value from the insurance company. Mr. Sero testified that by the time he inspected the pedal and the speed control cable the pedal was off the floor and the cable was free to move. Trial Tr., 34, 63, & 88, ECF No. 221. However, he testified that he saw evidence of contaminants in the guide tube. *Id*. at 49.

Under these facts, there is absolutely no evidence of spoliation. Clearly, Plaintiffs did not have continuous control over the vehicle, nor has Ford set forth any evidence that they "willfully engaged in conduct resulting in the evidence's loss or destruction." *Turner v. U.S.*, 736 F.3d 274, 282 (4th Cir. 2013) (citation omitted). Moreover, although Ford was well aware of Plaintiffs' theory of their case and the fact the pedal was in its normal position and the cable was not bound at the time it was inspected by Mr. Sero, Ford never raised the spoliation issue prior to its current motion. Thus, the Court further finds the motion untimely. *See Goodman*, 632

F. Supp.2d at 508 ("The lesson to be learned from the cases that have sought to define when a spoliation motion should be filed in order to be timely is that there is a particular need for these motions to be filed as soon as reasonably possible after discovery of the facts that underlie the motion. This is because resolution of spoliation motions are fact intensive, requiring the court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it was not preserved." (citation omitted)).

Additionally, Ford's suggestion that Officer Dent presented false evidence is without merit. Officer Dent presented evidence about what he observed at the scene, which was consistent with Mr. Nease's assertion that the accelerator pedal was stuck. The fact Officer Dent's observation of the pedal was different than what was found months later by Mr. Sero does not mean Officer Dent lied about what he saw. The jury easily could have determined that the cable became unbound and the pedal returned to its normal position between the date of the accident in November of 2012 and October of 2013, when Mr. Sero first inspected it. Therefore, the Court denies Ford's spoliation and false evidence arguments.

### E.
### Opinion Evidence

Next, Ford argues that the Court erred in allowing Plaintiffs' expert Dr. Mark Moreland to testify about matters outside Mr. Nease's medical record and by not disclosing those opinions pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure. As a result, Ford argues that its expert, Dr. Lisa Gwin, did not have the opportunity to add opinions to rebut Dr.

Moreland's testimony and develop a defense that sensory difficulties in Mr. Nease's foot resulted in pedal error.

Dr. Moreland was Mr. Nease's treating physician and also was disclosed as an expert witness by Plaintiffs on July 15, 2014. Plaintiffs stated in their disclosure that he would offer expert testimony "within . . . [his] respective areas of expertise, based upon . . . [his] respective knowledge of Howard Nease's course of treatment, care, diagnoses, prognoses, medical condition and future medical care needs related to the subject crash[.]" Exhibit C to *Pls' Resp. in Opp. to Ford Motor Co.'s Mot., in the Alternative, for a New Trial*, at 6, ECF No. 245-3. Dr. Moreland's testimony regarding what medications Mr. Nease took prior to the crash fell within his range of treatment. As such, it was unnecessary for Dr. Moreland to prepare a written expert report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. *See Order*, at 1-2, ECF No. 174 (holding "[t]he disclosures described in FR Civ P 26(a)(2)(B) shall not be required of physicians and other medical providers who examined or treated a party . . . unless the examination was for the sole purpose of providing expert testimony in the case"); *In re C.R. Bard, Inc.*, 948 F. Supp.2d 589, 616 (S.D. W. Va. 2013) (stating "treating physicians are, of course, able to testify as to opinions formed during the course of treatment"). Moreover, this testimony should have been of no surprise to Ford, and it certainly did not cause any unfair prejudice to Ford. *See id.* (finding any violation of Rule 26(a)(2)(B) was substantially justified or harmless to the extent the treating physicians offered opinions outside the scope of treatment because the defendant was not surprised, allowing the testimony did not disrupt the trial, and the plaintiffs relied upon a previous decision by the court in deciding not to submit expert reports).

As to Ford's arguments with respect to Dr. Gwin, the Court previously addressed these issues in its Memorandum Opinion and Order entered on March 19, 2015, finding she could not offer her opinion about whether Mr. Nease was experiencing side effects of his medications at the time of the accident. *Mem. & Op.*, at 2 ECF No. 186. As Dr. Gwin was an expert, and not a treating physician, she was required to put her opinions in an expert report. The Court decision to limit Dr. Gwin's testimony to those things contained in her report was not error.

## F.
## The Jury Award

Lastly, Ford argues that this Court should set aside or remit the jury verdict as excessive. Ford asserts the damages awarded for future medical care were against the clear weight of the evidence. At trial, Plaintiffs' forensic economist Zachary Meyers opined the present value of Mr. Nease's future life care plan was $239,741. Trial Tr., 21, Mar. 27, 2015, ECF No. 242. Despite no other present value calculation presented by Plaintiffs, the jury awarded $500,000 in future medical care and expenses. *Verdict Form*, 6, ECF No. 216. Ford argues the jury obviously speculated in making its decision because there was no evidence Mr. Nease would incur $500,000 in future medical care.

Plaintiffs argue, however, that Mr. Meyers testified that his figure was very conservative because he typically calculates damages up through age 100, but in Mr. Nease's case he stopped at age 86. Trial Tr., 25-26, ECF No. 242. Given Mr. Meyer's testimony, Plaintiffs assert the jury was free to award an amount greater than the bare minimum, particularly in light of Dr. Moreland and Cathy Gross' testimony that Mr. Nease will require future medical care.

"Remittitur, which is used in connection with Fed. R. Civ. P. 59(a), is a process . . . by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998) (quotation marks omitted). The decision as to whether a damage award is excessive and should therefore be set aside is "entrusted to the sound discretion of the district court." *Robles v. Prince George's Cty., Maryland,* 302 F.3d 262, 271 (4th Cir. 2002) (internal quotation marks and citation omitted). Under the practice of remittitur, "the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Cline*, 144 F.3d at 305 (internal quotation marks and citation omitted).

In this case, Mr. Meyers opined that $239,741 was a conservative figure for Mr. Nease's future medical care to age 86, for a total of 12.25 years based upon Ms. Gross's life care plan. Trial Tr., 20-21, ECF No. 242. He further stated that, in calculating the cost of future medical care, the amount of the life care plan is discounted each year by a person's life expectancy. *Id*. at 25. Thus, for each year the life care plan extends into the future, the lower the damages are because there is less chance of being alive at that age. For instance, Mr. Meyer calculated the Present Value of Total Life Care Plan for Mr. Nease at age 74 as $25,272. Exhibit 9B, at 3, ECF No. 227-17. At age 86, Mr. Meyers calculated the value at $12,732. *Id.* However, in this case, the jury more than doubled the amount of future medicals calculated by Mr. Meyers through age 86. Even if the jury believed Mr. Meyer's figure was too conservative and he should have calculated the damages through age 100, there is simply no evidence that the amount of damages from age 87 through 100 would exceed the future medical expenses Mr. Nease would incur between the ages of 74 and 86. In fact, such a calculation is contrary to Mr. Meyers' own

testimony that the present value for each year in the future would decrease. Therefore, the Court finds that a remittitur is appropriate and **GRANTS** Ford's motion on this issue. As Plaintiffs' best evidence was that Mr. Nease would incur $239,741 in future medical care and expenses, the Court reduces the jury award to that amount for his future medical care and expenses. If Plaintiffs do not agree to a remittitur, the Court will order a new trial on damages.

### III.
### CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Ford's motion Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure (ECF No. 238), and **DENIES, in part,** and **GRANTS, in part,** Ford's Motion, in the Alternative, for a New Trial pursuant to Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure. ECF No. 240. The Court also **DIRECTS** Plaintiff to notify the Court within seven (7) days of entry of this Memorandum Opinion and Order whether it accepts the remittitur or wants the Court to set a new trial. The Court also **GRANTS** Plaintiffs' Motion for Leave to Submit a Sur-Reply. ECF No. 250.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: July 24, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE